564 A.2d 180

Terri L. CALLENDER, Administratrix of the Estate of Gary Callender, and Terri L. Callender, in her Own Right

v.

GOODYEAR TIRE AND RUBBER CO., an Ohio Corporation, and Port Authority of Allegheny County, a Municipal Authority.

Appeal of GOODYEAR TIRE AND RUBBER CO.

Superior Court of Pennsylvania.

Argued Dec. 1, 1988.

Filed Aug. 18, 1989.

Reargument Denied Sept. 25, 1989.

284

John W. Jordan, IV, Pittsburgh, for Goodyear Tire, appellant.

Louis M. Tarasi, Jr., Pittsburgh, for Callender, appellee.

Michael J. Manzo, Pittsburgh, for Port Authority, appellee.

Before ROWLEY, DEL SOLE and MONTGOMERY, JJ.

ROWLEY, Judge:

This is an interlocutory appeal by permission by Goodyear Tire and Rubber Company (Goodyear), from an order denying the cross-summary judgment motions of Goodyear and appellee, Terri Callender (Callender)[1], in a wrongful death and survival action brought by Callender against both Goodyear and the Port Authority of Allegheny County (PAT) after her husband, Gary Callender, was killed by the explosion of a Goodyear bus tire while he was working in the Goodyear tire workroom at PAT's Ross Township bus maintenance garage. This appeal presents the issue of whether an employer, who is also a manufacturer of a product sold to the general public, may be liable under the dual capacity doctrine for a tort claim in the nature of a products liability action brought by an employee whose job is to maintain the manufacturer's product for the consumer, when the employee is injured by the product in the course of his employment. We hold that the dual capacity doctrine is inapplicable, and that the plaintiff's exclusive remedy is under the Workmen's Compensation Act. 77 P.S. § 1 et seq.

The facts of this case are as follows. Pursuant to the terms of a lease agreement between Goodyear and PAT, Goodyear provides PAT with all of its bus tires and maintains them. The maintenance of the tires is performed by a "tire changer" employed by Goodyear who works full time in each of the PAT maintenance garages.

At the PAT maintenance garage involved in this case, PAT maintained a separate room within the garage dedicated for the exclusive use of Goodyear. Goodyear's tire changer, the Decedent, worked alone in this room which was set off from the remainder of the garage by floor-to-ceiling walls of cinder block and one double door. Inside the room were the machines/tools supplied to the Decedent by Goodyear which were necessary for separating tires

---

1. Port Authority of Allegheny County (PAT) is also an appellee, but PAT does not address the dispositive issues. PAT's participation in the appeal is limited to preserving its claim for indemnity and contribution from Goodyear in the event that PAT is subsequently found to be liable to Callender. See footnote 2 herein.

from wheel rims, re-grooving tires and other maintenance which would regularly be performed on the tires.

PAT had an employee, called a "wheel changer," whose sole job was to remove tires from the buses and put the tires back on the buses. When the PAT wheel changer removed a flat tire, or upon his inspection noticed that a tire was worn unevenly or scuffed on the side, he would remove the tire from the bus and roll it to the outside of the Goodyear tire room. The Decedent then decided on·his own whether and/or how to repair the tire. If a repair were to be performed or if the tire needed to be mounted on or dismounted from the rim, the Decedent would roll the tire into the Goodyear tire room.

New tires, tires which were about to be worked on by the Decedent, and tires which the Decedent had just finished working on were the only tires which ordinarily would be in the Goodyear tire room at any time. Most tires which were awaiting repair were kept along the wall outside of the door into the Goodyear tire room. Most repaired tires or tires brought out of storage and placed on wheels ready to be put on the busses by the PAT wheel changer were kept in an area outside the Goodyear tire room but inside the PAT garage. Two several-inch-diameter pipes no higher than waist high contained the area where most of these tires were kept. The number of tires in this pen outside the Goodyear tire room at the time of the accident was between 20–30. In addition, over 100 tires, not yet ready to be used, were stored adjacent to the penned area in the maintenance garage but outside of the Goodyear tire room. New tires were often kept inside the Goodyear tire room for security reasons.

Decedent was hired as a Goodyear tire changer by a Goodyear field manager who was responsible for supervising each of the Goodyear employees at the various PAT maintenance garages. The field manager trained the Decedent how to maintain the tires, how to remove tires from and replace tires on the rims, how to maintain the inventory cards for each tire handled by the Goodyear employee, how

to inflate the tires, and other similar tasks. The Goodyear field manager regularly, often as frequently as weekly, would stop into each of the garages where a Goodyear tire changer was employed to check on the work that was being performed by the Goodyear employee, to ensure that it was satisfactory by Goodyear's standards, and to see if there were any complaints from the PAT garage supervisor. The Goodyear manager also had the authority to fire the Goodyear tire changers.

Callender admits that Goodyear was the Decedent's employer (answer to interrogatory # 12 of PAT). The PAT employees, including the supervisor of the PAT garage, never told the Decedent what to do or how to do it. The PAT employees rarely, if ever, went into the Goodyear tire room, although some PAT painting and cleaning supplies were stored in the Goodyear tire room.

The specific tire which exploded in this case was a regrooved one which PAT employees had trucked, along with numerous others, from PAT's tire storage facility on the Southside, to the maintenance garage where Decedent worked so that it could be mounted on a rim and put back into use. Apparently the Decedent had remounted the tire in question and placed it, still in the Goodyear tire room, approximately three to four feet away from where he was working on another tire when the tire exploded.

Although receiving Workmen's Compensation benefits, Callender brought the present products liability and negligence action against Goodyear and PAT. Goodyear sought summary judgment on the basis that Gary Callender was its employee at the time of the accident, he was killed while performing his responsibilities as an employee, and therefore, the Workmen's Compensation Act's exclusivity provision, Act of June 2, 1915, P.L. 736, No. 338, Section 303, as amended 1974, December 5, P.L. 782, No. 263, Section 6, 77 P.S. § 481, precludes Goodyear from any tort liability. Callender sought summary judgment as to Gcodyear's liability on the theory that there was no material question of fact that Goodyear was the manufacturer of the tire which killed

Gary Callender. Both motions were denied, and the trial court certified its order denying the summary judgment motions as involving a controlling question of the applicability of the exclusivity provision of the Workmen's Compensation Act, and the judicial doctrine of "dual capacity."

Two issues are raised on appeal: 1) is there a material question of fact as to whether the Decedent was under the control and direction of Goodyear or PAT at the time of his death; and 2) if the Decedent was an employee of Goodyear and under its control at the time of his death, does the dual capacity doctrine preclude Goodyear from avoiding liability on the basis of the exclusivity provision of the Workmen's Compensation Act. For the reasons set forth below, we conclude that there is no material question of fact that the Decedent was an employee of Goodyear and under its control at the time of his death, and that Callender's exclusive remedy is that provided in the Workmen's Compensation Act.

The scope of review of a motion for summary judgment is well established:

"A motion for summary judgment may properly be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.C.P. 1035(b). See also Rybas v. Wapner, 311 Pa.Super. 50, 52, 457 A.2d 108, 109 (1983); Williams v. Pilgrim Life Insurance Co., 306 Pa.Super. 170, 172, 452 A.2d 269, 270 (1982). In passing upon a motion for summary judgment, the court must examine the record in the light most favorable to the nonmoving party. Pocono International Raceway, Inc. v. Pocono Produce, Inc., 503 Pa. 80, 82, 468 A.2d 468, 470 (1983); Zimmerman v. Zimmerman, 322 Pa.Super. 121, 123, 469 A.2d 212, 213 (1983); Wilk v. Haus, 313 Pa.Super. 479, 480–482, 460 A.2d 288, 289–290 (1983). It is not part of the court's function to decide issues of fact but solely to determine whether there is an issue of fact

to be tried. *Wilk v. Haus, supra* at 482, 460 A.2d at 290; *Tom Morello Construction Co. v. Bridgeport Federal Savings & Loan Association,* 280 Pa.Super. 329, 334, 421 A.2d 747, 750 (1980). Any doubt must be resolved against the moving party. *Chorba v. Davlisa Enterprises, Inc.,* 303 Pa.Super. 497, 500, 450 A.2d 36, 38 (1982); *First Pennsylvania Bank, N.A. v. Triester,* 251 Pa.Super. 372, 378, 380 A.2d 826, 829 (1971)." *Thorsen v. Iron and Glass Bank,* 328 Pa.Super. 135, 140–141, 476 A.2d 928, 930–931 (1984). *Accord Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 203–204, 412 A.2d 466, 468–469 (1979); *Day v. Volkswagenwerk Aktiengesellschaft,* 318 Pa.Super. 225, 231, 464 A.2d 1313, 1316 (1983); *Rybas v. Wapner,* 311 Pa.Super. 50, 54, 457 A.2d 108, 109–110 (1983). However, parties seeking to avoid the entry of summary judgment against them may not rest upon the averments contained in their pleadings. On the contrary, they are required to show, by depositions, answers to interrogatories, admissions or affidavits, that there is a genuine issue for trial. Pa.R.C.P. 1035(d). The court, in ruling on a motion for summary judgment, must ignore controverted facts contained in the pleadings. *Phaff v. Gerner,* 451 Pa. 146, 303 A.2d 826 (1973); *Younginger v. Heckler,* 269 Pa.Super. 445, 410 A.2d 340 (1979). The court must restrict its review to the material authorized by Rule 1035 to be filed in support of and in opposition to the motion for summary judgment and *only* those allegations in the pleadings that are uncontroverted. *Phaff v. Gerner, supra.*

*Washington Federal Savings and Loan Association v. Stein,* 357 Pa.Super. 286, 288–290, 515 A.2d 980, 981 (1986).

Although the only issue raised by the appellant is whether or not the dual capacity doctrine applies to the facts of this case, this argument assumes, as Callender asserts, that Decedent was the employee of Goodyear. Therefore, preliminarily, we must address Callender's argument that whether the Decedent was under the control and supervision of Goodyear or PAT at the time of his death is a

material question of fact which must be determined by a fact finder. Callender does not deny that her husband was employed by Goodyear, (see Callender's answer to Goodyear's New Matter and Callender's Answer to PAT's interrogatories) but she contends that he was "loaned" to PAT, and therefore PAT, and not Goodyear, constitutes the Decedent's employer for purposes of the Workmen's Compensation Act.

When deciding whether a lending or borrowing employer is an employer for purposes of the Workmen's Compensation Act, any factual discrepancies are to be resolved by the trier of fact; however, once the facts are determined, the court must determine as a matter of law which employer is the employer for purposes of the Act. *Keller v. Old Lycoming Township*, 286 Pa.Super. 339, 345, 428 A.2d 1358, 1361 (1981).

In the present case, despite Callender's bald assertion in her brief that "there has yet to be a determination *of fact* of whether Goodyear or PAT controlled Gary Callender's work ..." Callender has failed to point to anything in the answers to interrogatories, depositions, or affidavits demonstrating a factual dispute. On the contrary, the depositions unequivocally set forth the facts: William Fischer, Supervisor of the PAT garage in which the accident occurred stated that he never told Decedent what to do; James Sucky, Goodyear's area field manager for the area including the PAT garage involved in this case, stated that the Decedent was not under the control and supervision of PAT, and that it was the complete responsibility of Goodyear to train and control someone holding Decedent's position; Hank Audette, Goodyear's field manager for tire changers in an area including the PAT garage in issue at the time of the accident, testified extensively about his regular supervision of Decedent and Decedent's work, how he had trained the Decedent, and the procedures which he instructed him to follow. Because nothing contained in the interrogatories, depositions or affidavits contradicts these facts, Callender has failed to establish that there is a disputed *factual* issue.

In resolving the *legal* issue of whether Goodyear or PAT was the employer of the Decedent for purposes of the Workmen's Compensation Act, we bear in mind that:

[ ]The crucial test in determining whether a servant furnished by one person to another becomes the employe of the person to whom he is loaned is whether he passes under the latter's right of control with regard to not only the work to be done but *also as to the manner of performing it....*

[ ]A servant is the employe of the person who has the *right* of controlling the manner of his performance of the work, irrespective of whether he actually *exercises* that control or not.

*Supp v. Erie Insurance Exchange,* 330 Pa.Super. 542, 547–548, 479 A.2d 1037, 1039–1040 (1984), citing *Mature v. Angelo,* 373 Pa. 593, 595–596, 97 A.2d 59, 60 (1953) (citations omitted) (emphasis in original); *Keller, supra.* Because the undisputed facts in this case demonstrate that Goodyear hired the Decedent, trained him, supervised him, told him what to do and how to do it, and because there is no evidence in the depositions and no affidavit even suggesting that PAT had the *right* to control any aspect of the Decedent's employment, we conclude as a matter of law, that Goodyear was the employer of the Decedent for purposes of the Workmen's Compensation Act.

Finding no merit to Callender's argument that there is a factual issue as to whether Goodyear was the Decedent's employer, we turn now to appellant's argument that the exclusivity provision of the Workmen's Compensation Act bars the present action, and the judicially created dual capacity doctrine does not apply to the facts of this case.

The dual capacity doctrine has been defined in the following manner:

Under this doctrine, an employer normally shielded from tort liability by the exclusive remedy principle may become liable in tort to his own employee if he occupies, in addition to his capacity as employer, a second capacity

that confers on him obligations independent of those imposed on him as an employer.

2A Larson, *Workmen's Compensation Law,* § 72.80, p. 14–112 (1976). Although this is the initial definition given to the dual capacity doctrine by Professor Larson, since 1976 Professor Larson has revised his description of the doctrine. He now refers to it as the "dual-persona" doctrine, which he distinguishes from the "dual capacity" doctrine on the basis that it "correct[s] the looseness and overextension attending the so-called 'dual capacity' doctrine." 2A Larson, *Workmen's Compensation Law,* § 72.81(a), p. 14–229 (1988). Professor Larson defines the dual persona doctrine as follows:

an employer may become a third person, vulnerable to tort suit by an employee, if—and only if—he possesses a second persona so completely independent from and unrelated to his status as employer that by established standards the law recognizes it as a separate legal person.

*Id,* § 72.80, p. 14–229.

The term "dual-persona" was chosen by Professor Larson because of the

"literal language of the typical third-party statute, which usually defines a third party, in the first instance, as 'a *person* other than the employer.' This is quite different from 'a person acting in a capacity other than that of employer.' The question is not one of activity, or relationship—it is one of identity."

*Id.,* § 72.81(a) p. 14–231.

Professor Larson also explains that the "dual capacity" doctrine only flourished in two jurisdictions—Ohio and California—and only from 1977 to 1983. By 1983, the California legislature had abolished the dual capacity doctrine and the Ohio Supreme Court had substituted the "dual persona" doctrine for the dual capacity doctrine. *Id.,* at § 72.81(c), pp. 14–236—14–245. As further evidence of the decline of the acceptance of the "dual capacity" doctrine, "It is now held with virtual unanimity that an employer, who is also

the manufacturer, modifier, installer, or distributor of a product used in the work, cannot be held liable in damages to his own employee on a theory of products liability." *Id.,* § 72.83, p. 14–252.

The dual capacity doctrine was first followed, in Pennsylvania, without express reference to the name of the doctrine, in the concurring (but majority) opinion of Justice Roberts in *Tatrai v. Presbyterian University Hospital,* 497 Pa. 247, 255, 439 A.2d 1162, 1166 (1982), which was prior to the demise of the doctrine in the two jurisdictions in which it was most popular. In *Tatrai,* a Presbyterian University Hospital operating room technician became ill during her regular working hours. On her supervisor's instructions, she went to the hospital's own emergency room where she was injured when the x-ray table she was laying on collapsed. The injured worker sued the hospital for negligence and breach of warranty of the hospital's services and equipment. A majority of the Supreme Court held that because the worker was injured while receiving emergency treatment in the hospital's emergency room which serves the public, the employee at the time she was injured was in the same position as any other member of the public receiving treatment in the hospital's emergency room. Thus, the same duty which the hospital owed general members of the public who used the services of the emergency room was also owed to the employee when she happened to use the services of the hospital's emergency room.

In *Budzichowski v. Bell Telephone Co. of PA,* 503 Pa. 160, 469 A.2d 111 (1984), the Court refused to apply the dual capacity doctrine where the employee, injured while in the course of his employment, received allegedly negligent treatment for those injuries from the employer's own doctors working in the employer's Medical Dispensary. The asserted reason for the inapplicability of the doctrine was that the employer's, Bell Telephone's, Medical Dispensary did not provide services to the general public but only to Bell employees. Therefore, when the Medical Dispensary doctors allegedly negligently diagnosed the employee's inju-

ries, the doctors, on behalf of Bell, were acting in the capacity of Bell as an employer and not as a provider of services or goods to the public. Consequently, the Court held that the employee's exclusive remedy was provided by the Workmen's Compensation Act.

Subsequently, in *Lewis v. School District of Philadelphia*, 517 Pa. 461, 538 A.2d 862 (1988), the Supreme Court addressed the issue of whether the dual capacity doctrine applies to bar an employee from recovering uninsured motor vehicle insurance benefits from his employer, where the employer is self-insured, as compensation for injuries sustained by the employee in a motor vehicle while the employee was engaged in the performance of his employment duties. *Lewis* involved three consolidated cases with similar factual circumstances. In one of the three cases, the plaintiff was a school bus driver who was injured when the school bus he was driving in the course of his employment was involved in an accident with an uninsured motorist. Although he received workmen's compensation benefits, the school bus driver also sought uninsured motorist benefits from his employer who was self-insured. In the other two cases, Philadelphia police officers were injured when the cars they were riding in, in the course of their employment, were involved in accidents with uninsured motorists. Again, workmen's compensation benefits were paid to the policemen, but uninsured motorist benefits were not paid by the employer. The Court held:

> It is thus clear that the focus of the "dual capacity" exception is on the circumstances in which the worker's injury occurs. But no such exception can exist where, as in the matters now before us, the employee's compensable injury occurred while he was actually engaged in the performance of his job.

*Id.*, 517 Pa. at 475, 538 A.2d at 869.

Most recently, the Supreme Court has discussed the dual capacity doctrine in the context of "whether a products liability claim can be asserted against an employer who is also the manufacturer of the equipment which caused the

employee's injury." *Heath v. Church's Fried Chicken, Inc.,* 519 Pa. 274, 276, 546 A.2d 1120, 1121 (1988). In *Heath,* the employer manufactured, solely for the use of its own employees, a "chicken saw." The plaintiff/employee was injured while operating the chicken saw, and, after receiving workmen's compensation benefits for her injuries, brought a product's liability action against her employer as the manufacturer of the chicken saw. In concluding that the dual capacity doctrine did not apply, the Court summarily referred to the above-quoted language from *Lewis,* stating that when the injury occurs *while the employee is actually engaged in the performance of her job,* the dual capacity doctrine, as judicially created in Pennsylvania does not apply. *Id.*

An examination of *Tatrai, Budzichowski, Lewis* and *Heath* reveals that the Supreme Court has used two distinct analyses in deciding whether the dual capacity doctrine applies to a particular situation. In its two earliest cases, *Tatrai,* and *Budzichowski,* it addressed the issue from the standpoint of whether there was a separate duty owed by the employer to the public, and whether the employee could be distinguished from a member of the public to whom that duty was owed. However, in its most recent cases, *Lewis* and *Heath,* it has retreated from application of the traditional dual capacity analysis of whether the *employer* was acting in a separate capacity, and instead has focussed exclusively on whether the *employee* was acting in the course of his or her employment. We find the change in the Court's analysis significant particularly in light of the fact that the Court could have reached the same result in both *Lewis* and *Heath* had it applied its previously established *Tatrai/Budzichowski* analysis. We also note that the Court's new analytical framework developed in *Lewis* and followed in *Heath* is distinguishable from the dual persona doctrine which is replacing the dual capacity doctrine: under *Lewis* and *Heath,* the status or identity of the *employer* is entirely irrelevant; the only significant fact is what the *employee* was doing when the accident occurred.

In the present case, Callender seeks to recover from the Decedent's employer on the theory that Goodyear defectively manufactured the tire which killed the Decedent. Factually, the case is indistinguishable from *Lewis* and *Heath* because the injury occurred while the employee was engaged in the course of his employment. However, the present case is distinguishable from any Pennsylvania products liability case in which the employee has sought to invoke the dual capacity doctrine because the allegedly defective product in the present case was not one manufactured by the employer for use by its employees and not for use by the general public. See *Heath supra; Pavlek v. Forbes Steel & Wire Corp.*, 358 Pa.Super. 316, 517 A.2d 564 (1986). On the contrary, the allegedly defective product manufactured by Goodyear is made expressly for use by the general public. Thus, the narrow issue which we must resolve is whether, under the Pennsylvania Supreme Court's development of the judicially created dual capacity doctrine, the single fact that a manufacturer's product which injures one of its employees is a product available to the general public and is not one manufactured exclusively for use by its own employees, subjects the employer to tort liability for its employees.

At least two other jurisdictions have addressed this precise problem, and have concluded that under the dual persona doctrine, the employer is not liable to its employees for injuries sustained by the employee in the course of his or her employment as a result of an allegedly defective product manufactured by the employer for use by the general public.

In *Wells v. Firestone Tire and Rubber Company*, 421 Mich. 641, 364 N.W.2d 670 (1984), the plaintiff was employed by Firestone at one of its retail stores. The employee was injured when, in the course of his employment, he was changing a tube and tire on a truck rim, and the rim blew apart. The court rejected the dual capacity theory and adopted the dual persona theory described by Professor Larson. The Court stated:

the [dual capacity] doctrine is applicable only in those situations where the employer has a second identity which is completely distinct and removed from his status as employer.

*　　*　　*　　*　　*　　*

The great majority of American jurisdictions have held that an employer who manufactured the injury-causing device cannot be held liable to his employee under a products liability theory. *Id.*, § 72.83, p. 14–239. Furthermore, the fact that the injury-causing product was also sold to the public is unimportant:

> "What matters is that, *as to this employee,* the product was manufactured as an adjunct of the business, and furnished to him solely as an employee, not as a member of the consuming public. What the employer does with the rest of his output cannot change this central fact." *Id.*, § 72.83, p. 14–246 (emphasis in original).

*Wells, supra.,* at 653, 364 N.W.2d at 675–676.

Similarly, in *Toth v. Westinghouse Elevator Company,* 114 Ill.App.3d 905, 70 Ill.Dec. 658, 449 N.E.2d 1005 (1983), a Westinghouse Elevator Company employee, whose job was to repair Westinghouse elevators, was injured as a result of allegedly defective Westinghouse elevator machinery and parts while he was trying to repair a Westinghouse elevator. The court refused to allow him to proceed against Westinghouse Elevator Company in a products liability action under the dual capacity theory. On the contrary, the court applied the dual persona doctrine, which the Illinois Supreme Court had previously adopted, and held that the issue was not whether the "employer occupied a second, independent role," but "whether the controversy involved separate legal entities or *persona.*" *Id.*, at 660, 440 N.E.2d at 1007.

Considering that the Pennsylvania Supreme Court has not found the dual capacity doctrine to be applicable since 1982, which was prior to the commencement of the trend to abandon the doctrine in favor of the dual persona doctrine;

considering that the Supreme Court in 1982 and 1984, in *Tatrai* and *Budzichowski*, respectively, applied the traditional dual capacity analysis which focuses on the obligations of the employer rather than the employee to determine whether an employee's remedies are limited to those provided in the Workmen's Compensation Act, but abandoned this method of analysis in 1988 in *Lewis* and *Heath*, and instead adopted one which examines exclusively the nature of the employee's actions at the time of the accident; and considering that the majority view from other jurisdictions is that an employer which is also a manufacturer of a product used by its employees cannot be held liable to its employee in tort, we hold that the dual capacity doctrine is inapplicable in the present case, and the exclusivity clause of the Workmen's Compensation Act bars Callender's action against Goodyear.[2]  Therefore, the trial court erred in denying Goodyear's motion for summary judgment against Callender.

Order denying Goodyear's Motion for Summary Judgment is reversed.  Case is remanded for entry of Summary Judgment in favor of Goodyear, and for any further appropriate proceedings concerning defendant PAT.

DEL SOLE, J., files a concurring statement.

DEL SOLE, Judge, concurring.

I concur with the Majority's decision in this case.  I believe that the issue presented is controlled by the Supreme Court decisions in *Heath v. Church's Fried Chicken*, 519 Pa. 274, 546 A.2d 1120 (1988) and *Lewis v. School District of Philadelphia*, 517 Pa. 461, 538 A.2d 862 (1988).

However, I join with the concern expressed by Mr. Justice Papadakos in his Concurring Opinion in the *Heath* case.

---

2.  Insofar as Goodyear's motion for summary judgment did not address the question raised in appellee PAT's brief regarding Goodyear's contractual obligation to PAT for contribution and indemnity for any liability incurred by PAT in an action such as the present one, and insofar as the summary judgment in favor of Goodyear would not automatically terminate Callender's suit against PAT, we make no decision concerning the contractual liability of Goodyear to PAT for contribution and indemnity.

Specifically, where an employer has placed into the stream of commerce a product which subsequently causes injury to an employee, a manufacturer of that defective product should not escape liability because of the employer/employee relationship. California has statutorily made this provision and I believe that Pennsylvania should consider such a change. However, under the existing law of the Commonwealth I believe that the majority is correct and, therefore, concur in the result.